# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **KIRSTEN MAJESKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 07 C 3206** |
| **v.** ) | |
| ) | **Magistrate Judge Maria Valdez** |
| **METROPOLITAN LIFE INSURANCE CO.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kirsten Majeski has sued the Metropolitan Life Insurance Co. ("MetLife") to reinstate disability benefits pursuant to § 502(a)(1)(B) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.[1]  The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons that follow, Majeski's motion for summary judgment [Doc. No. 29] is denied, and MetLife's motion for summary judgment [Doc. No. 56] is granted.

## FACTS

Unless otherwise stated, the following facts are either undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.  Majeski's claim involves disability income benefits and seeks to restore her disabled employee status and all corresponding employee benefits, including health insurance, life insurance, and

---

[1]  Majeski's motion is brought, in the alternative, pursuant to Federal Rule of Civil Procedure 52.

prescription coverage insurance. (Pl.'s LR 56.1(a)(3) ¶ 1.) Majeski's suit is brought pursuant to

§ 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). (*Id.*) Title 29, United States Code §

1132(e)(1) and § 1132(f), grant the District Court jurisdiction over the parties and over the

subject matter of this dispute. In addition, the Court has subject matter jurisdiction pursuant to

28 U.S.C. § 1331. (*Id.* ¶ 2.) Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2)

and 28 U.S.C. § 1391. (*Id.* ¶ 3.) The ERISA statute at 29 U.S.C. § 1133 provides a mechanism

for pre-suit internal appeals of benefit denials; Majeski exhausted all such appeals before filing

this suit. (*Id.* ¶ 4.)

Majeski is, and was at all times relevant to this proceeding, a resident of Chicago,

Illinois, located within the Northern District of Illinois. (*Id.* ¶ 5.) Her date of birth is December

12, 1947. (*Id.* ¶ 6.) Majeski was employed as a Nurse Consultant by MetLife until June 16,

2006, when she ceased working due to pain in her arms, hands, and shoulders, including

numbness in three fingers of her right hand.[2] (*Id.* ¶ 7.)

At all relevant times, MetLife provided benefits to its eligible employees pursuant to the

MetLife Options and Choices Plan ("Plan"), which incorporates by reference, *inter alia*, the

claims procedures and coverage provisions of the Short Term Disability ("STD") Summary Plan

Description and the Long Term Disability ("LTD") Summary Plan Description. (Def.'s LR

56.1(b)(3)(B) ¶ 8.) The Plan identifies the Plan Administrator as MetLife. (Def.'s LR 56.1(a)(3)

¶ 2.) The Plan expressly confers discretionary authority upon MetLife as the Plan

Administrator.[3] (*Id.* ¶ 3.)

_____

[2] Majeski remained employed with MetLife until October 13, 2006. (Def.'s LR 56.1(b)(3)(B) ¶ 7.)

[3] The Plan states:

The Administrator will have full power to administer the Plan in all of its details, subject to applicable

At all relevant times, MetLife's Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1), and incident to her employment, Majeski received coverage under the Plan as a "participant" as defined by 29 U.S.C. § 1002(7). (Pl.'s LR 56.1(a)(3) ¶ 9.) The Plan provides that the terms and conditions regarding eligibility for benefits are established in each constituent plan's Summary Plan Description. (Def.'s LR 56.1(a)(3) ¶ 4.) According to the STD Plan's Summary Plan Description ("SPD"), the policy defines "disabled" and "disability" as follows:

> "Disabled" or "Disability" means that due to illness or accidental injury:
> -- You are receiving appropriate care and treatment from a doctor on a continuing basis; and
> -- You are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy.
> Your loss of earnings must be a direct result of your illness or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, pay cuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

(Pl.'s LR 56.1(a)(3) ¶ 10.)

According to the SPD, benefits are payable under the policy as follows:

---

requirements of law . . . [including] (a) To make and enforce such rules and procedures as it deems necessary or proper for the efficient administration of the Plan, including the establishment of any claims procedures that may be required by applicable provisions of law; (b) To interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the Plan; (c) To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan; (d) To appoint such agents, counsel, accountants, consultants and other persons as may be required to assist in administering the plan; and (e) To allocate and delegate its responsibilities under the Plan and to designate other persons to carry out any of its responsibilities under the Plan, any such allocation, delegation or designation to be in writing.

The Administrator shall have full and final power and discretion to resolve all issues concerning eligibility, status and entitlement to coverage and benefits under this Plan and Constituent Plans.

(Def.'s LR 56.1(a)(3) ¶ 3.) The Plan also states that "[b]enefits will be paid under the Plan only if the Administrator, or its delegate, determines in its discretion that the applicant is entitled to them." (*Id.*)

<u>Temporary Disability Benefits</u>

Temporary disability benefits begin on the fourth work day of your Disability (or as early as the first workday of Disability if you are hospitalized as an in-patient) provided that:
-- Your Disability has been approved;
-- Your Disability has been continuous; and
-- You are under a doctor's care and are receiving active medical treatment for the disabling condition.
You will receive this benefit for as long as your Disability continues, to a maximum of 26 weeks.

If Your Disability Extends Beyond 26 Weeks
You may be eligible for long-term disability benefits if your Disability is approved and continues beyond 26 weeks. (See the Long Term Disability SPD for further details.)

(Pl.'s LR 56.1(a)(3) ¶ 11; *see* Def.'s LR 56.1(a)(3) ¶ 5-6.)

According to the SPD, under Statement of the Company's Rights, the policy states:

The Plan Administrator has full power and discretion to resolve all issues concerning eligibility, status, entitlement to benefits, and any other interpretations under the MetLife Options Plus program. Such interpretations or rulings will be binding on all parties.

(Pl.'s LR 56.1(a)(3) ¶ 12.)

On June 19, 2006, Majeski was treated at River Forest Chiropractic, Inc. by Michael J. Heatwole, D.C. (*Id.* ¶ 13.) Majeski continued chiropractic treatment on June 22, June 24, and June 26, 2006. (*Id.* ¶ 14.) On June 27, 2006, on a form requested by MetLife, Dr. Heatwole indicated that Majeski was incapacitated and that it was necessary for her to take leave from work in order to be treated for her impairment. Dr. Heatwole also checked a box indicating that Majeski was unable to perform any kind of work. (*Id.* ¶ 15.) Dr. Heatwole ordered Majeski to obtain an MRI from Oak Park Open MRI. (*Id.* ¶ 16.)

On June 21, 2006, Allan Boreland, Disability Case Manager for MetLife, conducted an initial interview with Majeski and recorded his notes. Boreland noted that Majeski reported her

symptoms as pain in the arms, hands, and shoulders, continuous numbness in three fingers on her right hand, and narrowing in disc C5-6. Majeski informed Boreland that she had a diagnosis of cervical radiculitis; she was seeing Dr. Heatwole three days a week for physical therapy; she had an appointment with Thomas F. Gleason, M.D., an orthopedic surgeon; and she expected to return to work in four to six weeks. (Def.'s LR 56.1(a)(3) ¶ 8.) Majeski received a letter from Boreland on June 21, 2006, indicating that STD benefits had been approved from June 19, 2006 through July 14, 2006, on the basis that Majeski was unable to work due to her participation in physical therapy three times a week. (Pl.'s LR 56.1(a)(3) ¶ 30; Def.'s LR 56.1(a)(3) ¶¶ 9-10.)

On July 5, 2006, Doris L. Yip, M.D. issued a report of an MRI taken of Majeski's cervical spine. The MRI findings showed that Majeski had mild to moderate degenerative arthritic changes of the cervical spine. Additionally, there was evidence of mild central stenosis [spinal cord narrowing] and moderate right and mild left neuroforaminal narrowing at C5-C6 and mild bilateral neuroforaminal narrowing at C6-C7 with mild to moderate central canal stenosis. (Pl.'s LR 56.1(a)(3) ¶ 17; Def.'s LR 56.1(a)(3) ¶ 11.) Dr. Yip also opined that the vertebral body heights and marrow signal intensities were within normal limits and that the cervical spinal cord caliber and signal were normal. (Def.'s LR 56.1(a)(3) ¶ 12.)

On July 11, 2006, Majeski underwent an electromyography and nerve conductor velocity test ("EMG/NCV"). Dr. Yip reviewed the EMG and opined that there was normal activity in both cervical paraspinal muscles. Dr. Yip further stated that there was normal activity in the biceps, normal activity in both brachioradialis, normal activity in both triceps, normal activity in both extensor digits, normal activity in both first dorsal interrosseous, and normal activity in both opponens pollicis. (*Id.* ¶ 13.)

On July 6, July 10, July 11, and July 13, 2006, Majeski returned for chiropractic treatment. (Pl.'s LR 56.1(a)(3) ¶ 18.) On July 12, 2006, Majeski underwent a physical therapy evaluation at Illinois Bone and Joint Rehabilitation Services. The assessment of the therapist on examination was that clinical findings were consistent with a diagnosis of cervical radiculopathy. The therapist indicated that continued physical therapy was medically necessary for Majeski. (*Id.* ¶ 19.)

On July 19, 2006, Majeski was treated by her orthopedic surgeon, Thomas F. Gleason, M.D. Dr. Gleason made a clinical diagnosis of a cervical radicular syndrome [irritation of the nerves in the cervical spine] with cervical spondylosis [degeneration] and findings of "degenerative disc disease C4 through C7 with spur/disc complexes with facet arthropathy and associated bulging, particularly on the right C5-6 which abuts the cord without displacement or change in signal, otherwise unremarkable." (Pl.'s LR 56.1(a)(3) ¶ 20; Def.'s LR 56.1(a)(3) ¶¶ 14-15.) Dr. Gleason also reviewed the July 3 MRI and the July 11 EMG/NCV and opined that the EMG/NCV reported "findings compatible with normal study with no evidence of radicular denervation" and "no areas of neuropathy found." (Def.'s LR 56.1(a)(3) ¶ 14.) Dr. Gleason recommended that Majeski receive an evaluation by Chandra Reddy, M.D., an anesthesiologist, for an epidural steroid injection; that Majeski continue physical therapy and thereafter an at-home exercise program; that she take Celebrex; and if there were no contraindications, that she may occasionally use over-the-counter medication. (*Id.* ¶ 17.)

On July 20, 2006, MetLife notified Majeski by letter from Wayette Statham-Bell, Disability Case Manager, that extension of STD benefits had been approved from July 15, 2006

through August 4, 2006, in order to allow Majeski time to proceed with ongoing treatment. (Pl.'s LR 56.1(a)(3) ¶ 31; Def.'s LR 56.1(b)(3)(B) ¶ 31.)

On July 21, 2006, Majeski saw Dr. Reddy, an anesthesiologist and Pain Management Fellow at the Holy Family Medical Center.  Dr. Reddy noted that Majeski reported having increasing pain from working on the computer, which developed into numbness and tingling sensations in her fingers.  The lab data reviewed during the examination included the MRI, which showed degenerative changes of the cervical spine, especially at the C5-6 level, and also some mild degenerative change at the C6-7 level.  Dr. Reddy's clinical finding and diagnosis was degenerative disease of the cervical spine with spinal stenosis and radicular symptoms of the upper extremity.  (Pl.'s LR 56.1(a)(3) ¶ 21.)  Dr. Reddy opined that: "There is no tenderness over the cervical spine.  Her range of motion of the cervical spine is normal except at severe extension."  Dr. Reddy stated that Majeski's range of motion of her cervical spine was normal except for "some discomfort" noted on extremes of right rotation and extension, and that "[o]ther movements of the neck are not painful.  There is no muscle spasm."  (Def.'s LR 56.1(a)(3) ¶ 20.) Dr. Reddy stated that Majeski's July 11 EMG was a negative study.  (*Id.* ¶ 22.)  On July 21, 2006, Dr. Reddy recommended that Majeski try Medrol Dosepak and suggested that if it did not alleviate her pain, she could consider a cervical epidural steroid injection.  (*Id.* ¶ 23.)

By letter on August 8, 2006, MetLife informed Majeski that it approved her leave taken from June 19, 2006 through August 25, 2006 under the Family and Medical Leave Act.  (*Id.* ¶ 18.)  The rationale for that decision was to allow Majeski to undergo an epidural injection for the treatment of her cervical radicular syndrome, which was evidenced by positive findings on the MRI, despite the normal EMG.  The case manager determined that it was reasonable to extend

benefits to allow for physical therapy completion and the resolution of pain and decreased range of movement and radicular symptoms. (Pl.'s LR 56.1(a)(3) ¶ 32; Def.'s LR 56.1(a)(3) ¶ 19.)

On August 14, 2006, Majeski was again treated by Dr. Gleason. According to a letter written by Dr. Gleason describing the office visit, he noted that the EMG showed no evidence of radicular denervation and no areas of neuropathy. However, Dr. Gleason stated that the July 3 MRI demonstrated degenerative disc disease at the C4 through C7 levels of the cervical spine with spur/disc complexes, and with facet arthropathy and associated bulging, particularly on the right at C5-6. Dr. Gleason's diagnosis was right cervical radicular syndrome with cervical spondylosis and findings as in x-ray and MRI scan as well as EMG/NCV study. (Pl.'s LR 56.1(a)(3) ¶ 22; Def.'s LR 56.1(a)(3) ¶ 24.) In his office visit note, Dr. Gleason recommended that Majeski "[f]ollow through with Dr. Reddy for consideration regarding epidural steroid injection." (Def.'s LR 56.1(a)(3) ¶ 25.) In his note, Dr. Gleason also recommended that Majeski's treatment include a home exercise program and stated that she "will follow-up in a four-week period of time for further evaluation and consideration of further treatment which could include return to work at that time." (*Id.* ¶ 26.)

On August 22, 2006, Majeski was examined by David Weiss, M.D., a physiatrist at Marionjoy Medical Group West Suburban Rehabilitation and Sports Medicine. (Def.'s LR 56.1(a)(3) ¶ 27; Pl.'s LR 56.1(a)(3) ¶ 24.) In his examination notes, Dr. Weiss stated that Majeski reported that "[s]he has tried a Medrol Dose Pack which has helped quite a bit, and she is seeing an orthopedic surgeon who is recommending a steroid injection for which she now wants a second opinion." (Def.'s LR 56.1(a)(3) ¶ 27.) Dr. Weiss opined that Majeski's extremities were normal, she had normal tone in all four extremities, normal strength of all

9

myotomes tested in all four extremities, normal coordination of all four extremities, and normal reflexes of all four extremities. (*Id.* ¶ 28.) Dr. Weiss also noted that Majeski reported pain upon palpation (trigger points) in several muscle groups. (*Id.* ¶ 29.) He stated that the July 3 MRI study showed mild to moderate degenerative changes and that the July 11 EMG ruled out cervical radiculopathy. (*Id.* ¶¶ 30-31.) Dr. Weiss concluded that Majeski had multifactorial etiologies for her pain, which was a direct result of weakness of her lower scapular stabilizers, decreased flexibility, decreased endurance, and working on the computer. (*Id.* ¶ 32.) He prescribed a two-week course of Relafen, in conjunction with ice and topical anti-inflammatories. He further recommended that Majeski obtain an Acu-massager, a Thera-cane, a Real-Ease pillow, and a Tempur-Pedic pillow and noted that "she will start physical therapy and a home exercise program to improve her lower scapular stabilizer strength and increase the flexibility of her cervical paraspinal muscles." (*Id.* ¶ 33.)

On August 25, 2006, Majeski received another physical therapy evaluation, from Emily Garbisch, PT DPT CSCS. The therapist noted the physician's diagnosis of myofascial pain syndrome. The therapist further noted Majeski's reports of pain throughout her neck and arm, which increased with sitting and typing more than five minutes. The therapist reported that Majeski had significant tenderness through the right midscapular region, upper trapezius, and latissimus dorsi. Functional deficits were noted, which included being unable to work and unable to type more than five minutes without an increase in symptoms. An examination showed numbness and tingling in the fingers. The therapist's assessment was that the results of the examination were consistent with the medical diagnoses and that Majeski had decreased cervical range of motion, poor strength of scapula and deep cervical stabilizers, overutilized

upper trapezius, poor cervical alignment, poor standing and sitting posture, and significant pain in all diagnosed musculature. (Pl.'s LR 56.1(a)(3) ¶ 23.) The therapist also stated that "Good for return to all previous activities without pain," and that Majeski could be expected to achieve pain free cervical range of motion in four to six weeks. (Def.'s LR 56.1(b)(3)(B) ¶ 23.)

On September 5, 2006, Nurse Lynn Booth of MetLife reviewed portions of Dr. Reddy's July 21, 2006 initial physical examination notes and Dr. Gleason's August 14, 2006 office visit note. (Def.'s LR 56.1(a)(3) ¶ 34; Pl.'s LR 56.1(b)(3)(B) ¶ 34.) She opined that Majeski's symptoms were intermittent, her cervical range of motion was functional, her shoulder range of motion was within normal limits, and her strength was near normal. (Pl.'s LR 56.1(a)(3) ¶ 34; Def.'s LR 56.1(a)(3) ¶ 34.) Nurse Booth concluded that "the objective findings do not support a functional impairment that precludes EE's [employee's] ability to perform the duties of her job." (Pl.'s LR 56.1(a)(3) ¶ 34; Def.'s LR 56.1(a)(3) ¶ 35.) On September 12, 2006, Nurse Booth reviewed Dr. Weiss's August 22, 2006 initial medical examination notes. Nurse Booth stated that Majeski's muscle tone, strength, and range of motion were functional. She opined that the objective medical findings did not support a functional impairment preventing Majeski from performing the functional requirements of her sedentary work as a nurse case manager. (Def.'s LR 56.1(a)(3) ¶ 36.) MetLife's Unit Manager agreed that the objective findings did not support a functional impairment. (Pl.'s LR 56.1(a)(3) ¶ 34.)

On September 14, 2006, Boreland, on behalf of MetLife, sent Majeski a letter informing her that after conducting a complete review of her file, MetLife concluded that her medical information did not support eligibility for STD benefits beyond August 25, 2006. (Def.'s LR 56.1(b)(3)(B) ¶ 33; Def.'s LR 56.1(a)(3) ¶ 37.) The letter acknowledged Majeski's pain

complaints but stated "pain is a subjective finding." (Pl.'s LR 56.1(a)(3) ¶ 35.) In that letter, Boreland cited the medical records, stating that the records submitted did not support a functional impairment that prevented her from performing her job. (Def.'s LR 56.1(b)(3)(B) ¶ 35.) The letter informed Majeski of her right to appeal MetLife's decision and requested that she support her appeal with "objective medical information that supports a functional impairment" which precluded her from performing the duties of her job as a nurse consultant. (Def.'s LR 56.1(a)(3) ¶ 37.)

In an October 9, 2006 letter, Ray McComb, the Human Resources Director at MetLife's Mount Prospect, Illinois office, informed Majeski that she may request a personal leave of absence or, alternatively, she may return to work by October 13, 2006. (*Id.* ¶ 38.) The letter informed Majeski that MetLife would discuss workplace accommodations in order to facilitate her return to work. The letter further stated: "If you do not show up to work or we do not hear from you by Friday, October 13, 2006, our records will indicate you have abandoned your position." (Def.'s LR 56.1(b)(3)(B) ¶ 37.)

On October 11, 2006, MetLife received an October 9, 2006 letter from Plaintiff's attorney providing a notice of intent to appeal and requesting a copy of the STD and LTD plans, along with any and all relevant documents. (Pl.'s LR 56.1(a)(3) ¶¶ 36, 38; Def.'s LR 56.1(a)(3) ¶ 39.)

On October 17, 2006, Majeski was again examined by Dr. Weiss. He noted that Majeski suffered from myofascial pain syndrome with muscle spasm in trigger points of various muscle groups. Dr. Weiss also noted Majeski's history of hypothyroidism, hypertension, left retinal occlusion, and low back pain, and recommended continued physical therapy and an additional

EMG test.  Upon reviewing the EMG in a report dated November 3, 2006, Dr. Weiss stated that there was electrodiagnostic evidence of bilateral mild carpal tunnel syndrome; however, there was no electrodiagnostic evidence of a right cervical radiculopathy.  (Pl.'s LR 56.1(a)(3) ¶ 24; Def.'s LR 56.1(a)(3) ¶ 50.)  His notes stated that Majeski was "quite a bit better"; she did not try ice or topical anti-inflammatories to reduce her pain; but she did get a Tempur-Pedic pillow, a Thera-cane, a roller ball, and a posture ball, "which have all helped."  (Def.'s LR 56.1(a)(3) ¶ 46; AR 169.)[4]  Dr. Weiss recommended that Majeski continue physical therapy to normalize the flexibility of her shoulders and pectoralis muscles and increase the strength of her lower scapular stabilizers, begin icing and using topical anti-inflammatories, and increase her home exercise program.  (Def.'s LR 56.1(a)(3) ¶ 49.)

On October 24, 2006, Majeski's attorney sent a letter to Boreland stating that the claim file was incomplete and did not include a job description or documentation of the STD plan, so he could not ascertain the definition of disability.  (Pl.'s LR 56.1(a)(3) ¶ 39.)  On November 2, 2006, MetLife responded to Majeski's request for complete Plan documents by directing her attorney to the Plan Administrator at Human Resources in New Jersey.  (*Id.* ¶ 40.)  Copies of the STD and LTD Summary Plan Descriptions were part of the administrative record, but the MetLife Options and Choices Plan was not submitted to Plaintiff's counsel until August 22, 2008, when it was filed with the court as part of MetLife's motion for summary judgment. (Def.'s LR 56.1(b)(3)(B) ¶ 36.)

On November 16, 2006, Dr. Weiss completed a Cervical Spine Residual Functional Capacity Questionnaire ("RFC") that purports to document Majeski's restrictions and limitations.

---

[4]  References to the Administrative Record are cited as AR ___ and can be found at Exhibit C to Defendant's LR 56.1(a)(3) statement of material facts.

That assessment reconfirmed a diagnosis of myofascial syndrome with both muscle spasms and muscle weakness. Dr. Weiss documented limited range of motion and reported left and right lateral bending to 75%. He further opined that Majeski could sit for 45 minutes at one time before needing to get up and that she could stand for 45 minutes at one time before needing to sit down or walk around. Dr. Weiss also assessed Majeski's physical capacities over the course of an eight-hour working day and found that she could sit for about four hours and could stand/walk for about four hours. He also anticipated that during an eight-hour workday, Majeski would have to take unscheduled breaks every 40 minutes for about five minutes. Dr. Weiss further described variability in Majeski symptoms, *i.e.*, she would be expected to experience good days and bad days. (Pl.'s LR 56.1(a)(3) ¶ 25.) In response to the question "Does your patient have significant limitation of motion," Dr. Weiss checked the box stating "No." Dr. Weiss also noted that Majeski had 100% cervical range of motion upon extension, flexion, and left rotation, and 75% cervical range of motion upon right rotation, left lateral bending, and right lateral bending. (Def.'s LR 56.1(a)(3) ¶¶ 51-52.)

Dr. Weiss also reported that Majeski had significant limitations with repetitive reaching and handling that limited the use of her hands for grasping, turning, and twisting object to 25% of an eight-hour workday and that prevent her entirely from using her arms for reaching. (Pl.'s LR 56.1(a)(3) ¶ 26; AR 138.) Dr. Weiss's RFC originally stated that Majeski could use her fingers for 100% of the day, but he amended his report (apparently on January 10, 2007, according to a note next to the changes) to state that she could use her fingers for fine manipulation 0% of the day.[5] (Pl.'s LR 56.1(a)(3) ¶ 26; AR 138.)

---

[5] In response to the question asking for "the percentage of time during an 8-hour working job that your patient can use hands/fingers/arms for the following activities," Dr. Weiss originally answered as follows:

On January 9, 2007, Susan Hardin, PT DPT MTC, of Physical Therapy Chicago, Ltd. performed a Functional Capacity Evaluation ("FCE") test upon Majeski. The therapist noted that Majeski would have problems if she returned to her previous job, as it requires sitting frequently and typing frequently. According to the FCE results, Majeski did not self-limit during the testing, and the results appeared to accurately portray her abilities. Majeski was found to have significant difficulty performing continuous typing due to pain throughout her right arm. (Pl.'s LR 56.1(a)(3) ¶ 27.) Hardin noted that after eight minutes and thirty seconds of typing, Majeski "complained of significant discomfort at the upper right trapezius," and Hardin stated that Majeski was "writhing, twisting, and elevating her right arm in order to alleviate the pain." (Def.'s LR 56.1(a)(3) ¶ 42.) Palpation revealed significant tenderness in various muscle groups, which was expected in an individual with myofascial pain syndrome. (Pl.'s LR 56.1(a)(3) ¶ 27.) In a section entitled "Job Match," the therapist stated:

> [Majeski] will need to vary her position to avoid sitting for too long as she scored capable of sitting Occasionally. Because her former job consists primarily of sitting and typing, the patient is unable to currently return to the position at MetLife Disability. If there is another position that falls within the Medium level that doesn't require sitting more than Occasionally, or one third of her work day, she may be able to return to work. Because of her sitting limitations, she should not be required to type more than Occasionally.

(Pl.'s LR 56.1(a)(3) ¶ 27; Def.'s LR 56.1(a)(3) ¶ 43.)

Harden noted that Majeski exhibited normal range of motion of the cervical spine, shoulders, wrists, and elbows, except for "mild limitations in cervical spine rotation bilaterally extension

|        | HANDS: Grasp, Turn, Twist Objects | FINGERS: Fine Manipulation | ARMS: Reaching (incl. Overhead) |
|--------|------|------|------|
| Right: | 25%  | 100% | 0%   |
| Left:  | 25%  | 100% | 0%   |

(Def.'s LR 56.1(a)(3) ¶ 53; AR 168.) The January 10, 2007 amendment changed both of the "Fine Manipulation" percentages from 100% to 0%, while leaving all other numbers the same. (*See* AR 138.)

and side bending bilaterally."  (Def.'s LR 56.1(a)(3) ¶ 42.)  Harden's FCE report also concluded that Majeski was capable of performing physical work at the "Medium" level throughout an eight-hour day, "though at the low end of Medium," which would include working as a registered nurse in a hospital or clinic.  (*Id.* ¶¶ 43-44.)

Majeski appealed MetLife's decision on January 25, 2007 and requested the opportunity to respond to any new information.  (Pl.'s LR 56.1(a)(3) ¶ 41.)  Along with her appeal, Majeski submitted notes from her October 17, 2006 follow-up office visit with Dr. Weiss; the repeat EMG study performed by Dr. Weiss on November 3, 2006; the RFC questionnaire completed by Dr. Weiss on November 16, 2006; and the January 9, 2007 FCE prepared by Hardin.  (Def.'s LR 56.1(a)(3) ¶ 41.)

On February 5, 2007, MetLife's Unit Manager determined that Majeski's claim should go to appeals and not reinstate on the office level.  A February 6, 2007 MetLife Decision rationale of this determination stated that, according to the January 2007 FCE, Majeski could work at the medium level for an eight-hour day; however it also states that she would have difficulty sitting for prolonged periods of time.[6]  (Pl.'s LR 56.1(a)(3) ¶ 42.)

On February 1, 2007, physical therapist Garbisch stated in a progress report that Majeski continues to complain of pain radiating into the elbow and occasionally into the forearm which gets progressively worse throughout the day.  The therapist noted objective findings of prominent cervical thoracic junction.  The therapist's assessment was that Majeski had made minimal gains and had been unable to progress with the therapeutic exercises in the past four weeks due to increased symptoms including frequent "spasms" during cervical range of motion

---

[6]  The body of the Decision Summary states that Majeski "is a Registered Nurse.  Occupation is medium."  However, in the introductory Job Title and Job Class sections of the same document, her title is correctly listed as "Nurse Consultant" and her Job Class is correctly listed as "Sedentary."  (AR 105-06.)

and posture corrections.  The therapist noted that Majeski continued to have significant strength deficit in the upper extremity and very poor cervical alignment, which also showed little improvement.  (*Id.* ¶ 28.)

On February 6, 2007, Majeski was examined by Sandeep K. Aggarwal, M.D., a neurologist.  (*Id.* ¶ 29.)  MetLife received the examination record for this visit on February 27, 2007.  (Def.'s LR 56.1(a)(3) ¶ 58.)  Dr. Aggarwal diagnosed cervicalgia with a right C7 sensory radiculopathic component, with associated trigger points suggestive of fibromyalgia. Additionally, Dr. Aggarwal noted electrodiagnostic evidence of minimal, bilateral medical mononeuropathy at the wrists [carpal tunnel syndrome].  (Pl.'s LR 56.1(a)(3) ¶ 29.)  He stated that the November 3, 2006 EMG/NCV test demonstrated minimal carpal tunnel syndrome without ongoing denervation.  (Def.'s LR 56.1(a)(3) ¶ 60.)  Dr. Aggarwal also opined that there was "no evidence of the right upper extremity radiculopathy or clinical evidence of myelopathy." (*Id.* ¶ 61)

Philip Marion, M.D. performed a physician review at the request of MetLife and issued a report on March 1, 2007 after reviewing all of Majeski's medical records, including the records of Drs. Gleason, Reddy, and Weiss, and Hardin's FCE report.  (Pl.'s LR 56.1(a)(3) ¶ 43; Def.'s LR 56.1(a)(3) ¶ 56.)  In his report, Dr. Marion opined that:

> There are minimal objective findings on physical and neurological examination. The (initial) normal EMG and (repeated) EMG study demonstrating mild median nerve slowing is also not consistent with the inability to work at least at the sedentary level. . . . From a physical medicine & rehabilitation/pain management perspective the medical information available for review and the FCE information in the claim file does not document nor is it reasonable to conclude from it, that the claimant has functional limitations that precluded sedentary work activity requiring sitting, using a computer and telephone subsequent to 08/25/2006.

(Pl.'s LR 56.1(a)(3) ¶ 43; Def.'s LR 56.1(a)(3) ¶¶ 56-57.)

On March 27, 2007, Dr. Marion issued a supplemental report, which stated that additional records admitted, including Dr. Aggarwal's examination, did not change his opinion that Majeski was not disabled as of August 26, 2006. (Pl.'s LR 56.1(a)(3) ¶ 43; Def.'s LR 56.1(a)(3) ¶ 64.) On March 28, 2007, MetLife sent Dr. Marion's March 1, 2007 report to Drs. Weiss and Aggarwal and asked them to comment on his opinions and conclusions. (Def.'s LR 56.1(a)(3) ¶ 65.) MetLife specifically asked the physicians to address Majeski's impairments, restrictions, and limitations; to cite clinical evidence supporting their conclusions; and to respond to MetLife by April 10, 2007. On April 6, 2007, Dr. Weiss faxed to MetLife a note handwritten on a prescription pad stating "I disagree with the decision of Dr. Marion." (Pl.'s LR 56.1(a)(3) ¶ 45; Def.'s LR 56.1(a)(3) ¶ 67.) Dr. Aggarwal did not respond to MetLife's request for commentary regarding Dr. Marion's reports by April 10, 2007. (Def.'s LR 56.1(a)(3) ¶ 68.)

On April 18, 2007, Majeski's final appeal was denied in a letter by Thomas Tawyer, Appeals Specialist, which was sent to her attorneys. (Pl.'s LR 56.1(a)(3) ¶ 46; Def.'s LR 56.1(a)(3) ¶ 69.) The letter upheld Dr. Marion's conclusion that the information in the claim file and the FCE did not support functional limitations precluding sedentary work activity requiring sitting, using a computer, and using a telephone and stated that the additional medical information sent in the appeal did not change Dr. Marion's opinion. (Pl.'s LR 56.1(a)(3) ¶ 46; Def.'s LR 56.1(a)(3) ¶ 70.) This letter informed Majeski that she had "exhausted [her] administrative remedies under the plan" and "therefore no further appeals will be considered." (Def.'s LR 56.1(a)(3) ¶ 71; AR 116.)

**DISCUSSION**

A.    **SUMMARY JUDGMENT STANDARD**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  When reviewing the record, all reasonable inferences must be drawn in the light most favorable to the non-movant. *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship,* 209 F.3d 678, 682-83 (7th Cir. 2000).  When cross-motions for summary judgment are involved, those requirements demand a dual perspective, one that has been described as Janus-like, sometimes resulting in the denial of both motions. *See Coles v. LaSalle Partners Inc. Disability Plan,* 287 F. Supp. 2d 896, 900. (N.D. Ill. 2003); *Tevlin v. Metro. Water Reclamation Dist.,* 237 F. Supp. 2d 895, 897 (N.D. Ill. 2002).

B.    **ERISA STANDARD OF REVIEW**

Under ERISA's civil enforcement provision, § 1132(a)(1)(B), the judicial standard of review hinges on whether the language of the policy grants the plan administrator or fiduciary discretionary authority in making benefit determinations. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *Ruiz v. Cont'l Cas. Co.,* 400 F.3d 986, 989 (7th Cir. 2005).  As a default, courts review benefit determinations under ERISA by applying a *de novo* standard. *Firestone,* 489 U.S. at 115; *Ruiz,* 400 F.3d at 989.  However, when the plan contains language that confers discretion to the plan administrator or fiduciary, courts apply the arbitrary and capricious standard of review. *Firestone,* 489 U.S. at 114; *Ruiz,* 400 F.3d at 989; *see Leipzig v.*

*AIG Life Ins. Co.,* 362 F.3d 406, 408 (7th Cir. 2004).  In order to lower the level of judicial review from the *de novo* to the arbitrary and capricious standard, the language of the plan should "clearly and unequivocally state that it grants discretionary authority to the administrator." *Perugini-Christen v. Homestead Mortgage Co.,* 287 F.3d 624, 626 (7th Cir. 2002); *see Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 332 (7th Cir. 2000) (holding that the stipulation for deferential review "must be clear"); *see also Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506,* 545 F.3d 555, 559 (7th Cir. 2008) ("Where . . . the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, we review a denial of benefits under the arbitrary and capricious standard.").

In this case, the controlling ERISA Plan document contains language granting discretionary authority to MetLife, *e.g.*, "The Administrator shall have full and final power and discretion to resolve all issues concerning eligibility, status and entitlement to coverage and benefits under this Plan and Constituent Plans"; and the provision giving the Administrator the power "[t]o interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the Plan."  (Def.'s LR 56.1(a)(3) ¶ 3.)  Therefore, MetLife's denial of Majeski's benefits must be reviewed under the arbitrary and capricious standard.[7]

---

[7]  Majeski's amended opening brief argued that the *de novo* standard should apply because the official Plan document had not yet been produced by MetLife.  MetLife subsequently located the Plan and submitted it with its motion and response.  (*See* Def.'s LR 56.1(a)(3) Ex. B.)  In her response to MetLife's motion for summary judgment, Majeski admits that the Plan contains discretionary language but argues that the *de novo* standard should apply due to MetLife's failure to timely produce the Plan.  Majeski offers no support, however, that would allow this Court to change the well settled standard of review as a punishment for MetLife's dilatory production.

Under the arbitrary and capricious standard, an administrator's decision to deny a claimant's benefits is entitled to great deference. *Ruiz,* 400 F.3d at 991. A court will not disturb the benefit determination unless it is "downright unreasonable." *See Davis v. UNUM Life Ins. Co. of Am.,* 444 F.3d 569, 576 (7th Cir. 2006); *Ruiz,* 400 F.3d at 989; *Carr v. Gates Health Care Plan,* 195 F.3d 292, 296 (7th Cir. 1999); *see also Herzberger,* 205 F.3d at 329 (stating that determinations will be overturned only when they are "unreasonable, and not merely incorrect"). A plan administrator's benefit determination will be upheld when the decision is based on an informed judgment "that is satisfactory in light of the relevant facts, *i.e.,* one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached." *Exbom v. Cent. States, S.E. & S.W. Areas Health & Welfare Fund,* 900 F.2d 1138, 1143 (7th Cir. 1990).

However, the arbitrary and capricious standard of review is not a "rubber stamp and deference need not be abject." *Hackett v. Xerox Corp. Long-Term Disability Income Plan,* 315 F.3d 771, 774 (7th Cir. 2003). Even under this deferential standard, "the termination procedure and determination still must comply with the requirement of ERISA 'that specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for "full and fair review" by the administrator.'" *Leger v. Tribune Co. Long Term Disability Ben. Plan*, No. 08-1362, ___ F.3d ___, 2009 WL 579246, at *6 (7th Cir. Mar. 9, 2009) (quoting *Tate*, 545 F.3d at 559)). Moreover, a decision to terminate benefits will not be upheld "'when there is an absence of reasoning in the record to support it.'" *Id.*

In her reply brief, Majeski argues that the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), requires "a more penetrating

analysis" than courts had previously applied. *Glenn* held that when a single entity is both the plan administrator and payor of benefits, a conflict of interest is created, and "'a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits, and . . . the significance of the factor will depend upon the circumstances of the particular case.'" *Leger*, 2009 WL 579246, at *5 (quoting *Glenn*, 128 S. Ct. at 2346). However, "*Glenn* did not create a new standard of review – a 'heightened arbitrary and capricious standard' – for claims involving a conflict of interest." *Id.* at *6.

> The Court rejected the idea that it should abandon a deferential standard of review with respect to benefit determinations. Additionally, it did not believe that it was "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." . . . Instead, the Court determined that the conflict of interest was simply one of many factors that a court must consider in conducting its review.

*Id.* at *5 (quoting *Glenn*, 128 S. Ct. at 2351). The Court will therefore consider MetLife's conflict as plan administrator and payor (and employer) as a factor to be considered but will not apply a heightened standard of review.

To determine whether MetLife's decision was "downright unreasonable," this Court must examine whether there is rational support in the record for the determination that Majeski was not disabled. Majeski argues that MetLife's decision was unreasonable for the following reasons: (1) MetLife's decision to terminate benefits after previously approving STD benefits was improper in light of the fact that Majeski's condition had not significantly improved; (2) MetLife's termination decision rested upon the report of a reviewing physician who had a financial bias and lacked firsthand knowledge of Majeski's impairments; and (3) MetLife's decision to terminate based upon Majeski's subjective complaints of pain was not medically or

legally valid and was against the manifest weight of medical evidence.[8]  MetLife responds that its decision to terminate Majeski's STD claim was reasonable and based upon objective medical evidence demonstrating that she was not disabled.

### 1.      Denial After Approval of STD Benefits

MetLife approved Majeski's STD benefits beginning June 19, 2006 and terminated her benefits on August 25, 2006.  Majeski argues that she experienced no material medical improvements in the intervening time period and experienced the same, if not worse, symptoms. She contends that the decision to terminate benefits without a showing of medical improvement is suspect.  MetLife responds that Majeski's argument turns the arbitrary and capricious standard on its head and relies upon the false premise that a prior grant of benefits creates a burden-shifting presumption in favor of disability.

The Court agrees with MetLife that the initial finding of disability did not create an additional hurdle or shift any burden:

> The fact that a plan administrator has made an initial benefits determination in favor of the claimant is evidence that, at least initially, the administrator believed that the claimant was disabled as defined by the plan. However, as specifically noted by the Eighth Circuit, the previous payment of benefits is just one "circumstance," *i.e.*, factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome.

---

[8]    In an undeveloped argument that was not raised again in her response or reply briefs, Majeski also claimed that it was arbitrary and capricious for MetLife not to consider the vocational factors of her advanced age and occupation in denying her benefits.  Majeski argues that MetLife erroneously classified her occupation as a Registered Nurse, requiring a medium level of exertion, rather than her actual position as a Nurse Consultant, which is a sedentary job requiring sitting the majority of the day, filling out reports on a computer, and phone work, for eight hours a day. MetLife disputes that it misclassified Majeski's occupation, pointing to Dr. Marion's report which expressly stated her occupation was a nurse consultant.  (Def.'s LR 56.1(a)(3) ¶ 57.)  In any event, Majeski does not explain how MetLife's alleged misclassification of her position into one with a greater exertional level resulted in an erroneous denial of benefits.  Indeed, assuming that MetLife did misclassify her exertional level as medium rather than sedentary, it was arguably an error in her favor and would not have prejudiced her benefits determination.

*Leger*, 2009 WL 579246, at *7 (citing *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 589 (8th Cir. 2002)).

MetLife argues that it was reasonable for it to obtain independent medical advice and to terminate benefits based upon that advice, which was not available at the time of the original decision granting benefits.  The Court finds that, based upon the circumstances of the case, MetLife's denial of benefits was no more suspicious or deserving of scrutiny than if it had refused to grant the benefits in the first place.

## 2.    Bias of Reviewing Physician

Majeski challenges the conclusions of Dr. Marion, MetLife's reviewing physician, based upon his alleged financial bias and lack of firsthand knowledge of Majeski's condition.  In support of her claim of financial bias, Majeski attempts to submit a deposition of Dr. Marion in an unrelated case, in which he admitted that he earns nearly $100,000 annually from his work with Network Medical Review/Elite Physicians, which has a close relationship with MetLife; and that he finds patients disabled no more than 5-10% of the time.  MetLife argues that (1) the deposition was submitted to MetLife after Majeski exhausted her administrative remedies and therefore is not properly before this Court; (2) even if the deposition evidence were considered, a financial relationship does not, by itself, demonstrate a conflict; and (3) it is reasonable for a plan administrator to rely upon a consultant's review of a medical file.

### a.    *Admissibility of Evidence*

As an initial matter, the Court must determine whether it can consider the deposition testimony of Dr. Marion, which was not before the Plan Administrator.  At the same time, the Court will determine the admissibility of two other pieces of evidence that Majeski offers in

support of her motion for summary judgment: (1) a March 26, 2008 decision from the Social

Security Administration ("SSA"), in which it found that Majeski is disabled under the Social

Security Act; and (2) an April 11, 2007 note from Dr. Aggarwal, in which he expressed his

disagreement with Dr. Marion's conclusions and stated his belief that Majeski's "symptoms and

limitations [were] consistent with the residual functional capacity evaluation and suspect that her

returning to full duty would only serve to aggravate her current condition." (Pl.'s LR 56.1(a)(3)

¶ 44.)

Because the Court is reviewing MetLife's exercise of discretion under the arbitrary and

capricious standard, evidence that was not in the record before the Plan Administrator is not

relevant. *See Gutta v. Standard Select Tr. Ins. Plans*, 530 F.3d 614, 619 (7th Cir. 2008) ("When

discretionary power is conferred on the administrator, her decision is reviewed under the

arbitrary and capricious standard, . . . and the district court may consider only evidence that was

before the administrator in deciding whether her decision passes muster.") (citation omitted); *cf.

Diaz v. Prudential Ins. Co.*, 499 F.3d 640, 643 (7th Cir. 2007) ("[W]hen *de novo* consideration is

appropriate in an ERISA case, . . . the court can and must come to an independent decision on

both the legal and factual issues that form the basis of the claim. What happened before the Plan

administrator or ERISA fiduciary is irrelevant.").

MetLife contends that it received the deposition transcript and letter from Dr. Aggrawal

on April 19, 2007, the day after MetLife decided Majeski's administrative appeal and Majeski

had exhausted her administrative remedies. MetLife argues that its decision not to reopen the

administrative record in light of these submissions was reasonable. *See Petropoulos v. Outboard

Marine Corp. Employees Pen. Plan*, No. 94 C 5954, 1995 WL 452995, at *4 (N.D. Ill. July 27,

1995) (holding that federal policies of efficient plan management are circumvented by "[a]llowing plaintiff to exhaust internal remedies at his leisure, instead of following the time limits of the plan"); *see also Tegtmeier v. Midwest Operating Engineers' Pen. Tr. Fund*, 390 F.3d 1040, 1047 (7th Cir. 2004) ("The Pension Fund's decision not to reopen the claims process is completely proper, given the Pension Plan's concern for finality of decisions.").

Majeski argues that the transcript, the letter from Dr. Aggarwal, and the SSA decision should be considered by the Court. Majeski states, and MetLife does not dispute, that on April 12, 2007, Majeski's counsel sent a facsimile letter to MetLife. (Pl.'s LR 56.1(a)(3) ¶ 43.) The fax included a copy of Dr. Aggarwal's report and a summary of the evidence of alleged bias against Dr. Marion, without a copy of the deposition transcript attached. (AR 117-20.) Majeski states that because of the size of the transcript, a copy on CD-ROM was sent to MetLife by U.S. Mail that day. Also on April 12, a paralegal employed by Majeski's attorney followed up the fax with a voice mail to Borlund, advising him of the production and requesting until May 1, 2007 to provide comment and additional information. This request was allegedly ignored.[9] Moreover, Majeski argues that MetLife's claim that it did not receive the appeal supplementation until April 19, 2007 is false; MetLife's claim diary report includes a notation that "INFO RECEIVED FOR APPEALS PLEASE REVIEW LETTER REC'D ON 4/18/2007."[10] (AR 111.) Majeski states that MetLife acted in a manner inconsistent with its fiduciary obligations by closing the

---

[9]  The parties do not debate the point, but it appears that Borland attempted to call back the attorney's office on April 13 and left a voice mail on that date. (*See* AR 109.)

[10]  According to MetLife, there are conflicting notations in the file, the first showing a receipt date of April 19, the second showing April 18. MetLife also states that the Diary Review Report demonstrates that, whichever date the submissions were received, MetLife had already decided Majeski's final appeal. (*See* AR 110-11.)

claim after additional evidence was submitted and taking affirmative steps to prevent consideration of that evidence.

The Court concludes first that it will not consider the evidence of Dr. Aggrawal's letter or the SSA decision. It is not disputed that this evidence was not before the Plan Administrator, and it was not unreasonable for MetLife not to reopen its appeals process in light of the late submissions. *See Tegtmeier*, 390 F.3d at 1047. Even crediting Majeski with sending MetLife the Dr. Aggrawal letter by fax on April 12, that was two days after the date MetLife had set for written comments to Dr. Marion's report (a date that was extended from the original deadline of March 14, 2006). Majeski does not explain why she did not or could not ask for another extension prior to April 10. The SSA determination was also not available to the Plan Administrator, as the decision was made nearly a year after the internal appeals process was completed. Therefore, under the arbitrary and capricious standard of review, neither of these documents can be considered.[11]

The admissibility of the deposition transcript of Dr. Marion is not as clear-cut. Like the Aggrawal letter, the deposition transcript was not received by MetLife until after the time for appeal was over. However, the Court cannot conclude that none of the information contained in the deposition was before the Plan Administrator. MetLife acknowledges that Dr. Marion has performed and continues to perform a number of medical reviews for MetLife through his association with NMR. It defies logic to believe that the Plan Administrator had no information related to Dr. Marion's relationship with MetLife. The Court therefore concludes that it may consider general evidence that that Dr. Marion had an ongoing financial relationship with

---

[11] The Court therefore denies Majeski's Motion for Leave to Supplement [Doc. No. 40], which sought leave to amend its memorandum and exhibits to include references to the SSA determination.

MetLife in relation to Majeski's argument that Dr. Marion had a financial bias. But because it is not clear whether the administrator knew the details about the financial relationship or about Dr. Marion's self-assessment of the percentage of time he finds a disability, the Court will not consider that evidence.

             **b.**       ***Allegations of Dr. Marion's Bias***

Majeski states that Dr. Marion's findings are undermined by his bias, as demonstrated by his close financial relationship to MetLife. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (U.S. 2003) (citation omitted) (acknowledging the appellate court's "concern that physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements'"); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003) (stating that a consultant "hired by the administrator of a private plan . . . may have a financial incentive to be hard-nosed in his claims evaluation in order to protect the financial integrity of the plan and of the employer that funds it").

MetLife responds that Dr. Marion is not employed by MetLife, but that even if he did receive all of his compensation for one claims administrator, that alone would not be a basis to challenge his medical opinions. *See Davis*, 444 F. 3d at 575 ("[W]hether the administrator retains in-house doctors . . . or pays for freelance doctors makes no difference in this conflict analysis. Paying for a legitimate and valuable service in order to evaluate a claim thoroughly does not create a review-altering conflict."). MetLife contends that Dr. Marion's prior work for MetLife, without more, cannot support a "nefarious" conclusion and disputes that there is any evidence that Dr. Marion was unprofessional and rendered medically unsound opinions in this

case. Majeski claims that *Davis* is distinguishable because it only discusses the adequacy of reviewing doctors' findings rather than the specific evidence of bias Majeski claims in this case.

The Court finds that there is no evidence that Dr. Marion's financial relationship with MetLife created an irreconcilable conflict. Moreover, nothing about Dr. Marion's reports suggests that he was operating under a conflict in relation to his work on this case.

       *c.*     <u>**Lack of Firsthand Knowledge**</u>

Majeski also complains that Dr. Marion's opinion is suspect because he lacked firsthand knowledge of her condition and instead relied upon a file review. As a general rule, it is not improper for a plan administrator to rely upon the opinion of a physician who reviews only the medical file and conducts no physical examination. After finding no authority prohibiting doctors from arriving at professional opinions after reviewing medical files, the Seventh Circuit stated:

> In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation. It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.

*Davis,* 444 F.3d at 577, *cited with approval by Leger*, 2009 WL 579246, at *7.

Moreover, the opinions of treating physicians are not accorded any special deference in ERISA cases: "'[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Leger*, 2009 WL 579246, at *7 (quoting *Nord,* 538 U.S.

at 834). But although a plan administrator "need not give special weight to the opinions of the claimant's treating physicians, 'it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician.'" *Rudzinski v. Metro. Life Ins. Co.*, No. 05 C 474, 2007 WL 2746630, at *13 (N.D. Ill. Sept. 14, 2007) (citation omitted).

MetLife argues that unlike treating physicians, who may accept reported symptoms at face value, ERISA fiduciaries "must consider the possibility that disability applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." *Leipzig*, 362 F.3d at 409. The Court finds that it was not unreasonable for MetLife to have engaged Dr. Marion, a board certified specialist in physical medicine and rehabilitation, to perform a file review in making Majeski's disability benefits determination. Dr. Marion concluded that the medical evidence did not support functional limitations on Majeski's performance of sedentary work only after reviewing all medical records in the record. (Def.'s LR 56.1(a)(3) ¶ 56.) *Cf. Rudzinski*, 2007 WL 2746630, at *13 (holding that a court may find a benefits denial to be arbitrary and capricious "when the decision is based on a conclusion by a non-examining physician who did not examine the entire record and discounted relevant medical evidence'") (citation omitted).

### 3.    Medical Evidence

Majeski states that the objective medical evidence in the record supports a finding of disability and argues that there was no reasoned basis for the termination of benefits. According to Majeski, the Plan does not contain a provision allowing benefits to be terminated based upon subjective complaints of pain, and the rationale that pain is "subjective" is not a valid basis for

terminating disability benefits. *See Leger*, 2009 WL 579246, at *9; *Diaz*, 499 F.3d at 645-46;

*Hawkins,* 326 F.3d at 919.

Majeski asserts that she began experiencing discomfort in her right forearm and numbness in her first three fingers in January 2006, with the numbness later spreading to all of her fingers and leading her to stop working. She claims she has aggressively sought treatment from numerous professionals, including Drs. Gleason, Yip, Weiss, and Aggrawal; Dr. Heatwole, a chiropractor; and physical therapist Susan Hardin. Majeski states that her aggressive efforts to treat her symptoms support her allegations of pain. *See Diaz*, 499 F.3d at 646. Majeski also says that her evidence of pain is particularly strong because it is corroborated by objective medical evidence including MRI, EMG, and clinical evaluations by Drs. Gleason, Weiss, and Aggarwal. In addition, the functional capacity evaluation provides objective support for her claim that she was unable to perform the tasks of sitting and keyboarding, which were material to her job duties.

According to Majeski, the findings of all of her treatment providers support her claim of disability. Majeski claims that MetLife wrongfully downplayed evidence supporting a finding of disability, including: (1) Dr. Reddy's diagnosis of degenerative disease of the cervical spine with spinal stenosis and radicular symptoms of the upper extremity; (2) Dr. Gleason's report that an MRI demonstrated degenerative disc disease in the cervical spine; (3) Dr. Gleason's diagnosis of right cervical radicular syndrome with cervical spondylosis and findings on x-ray and MRI scan as well as an EMG/NCV study; (3) Dr. Weiss's report that Majeski suffered from myofascial pain syndrome with both muscle spasms and muscle weakness, and electrodiagnostic evidence of bilateral mild carpal tunnel syndrome; (4) Dr. Weiss's functional capacity

evaluation; (5) Dr. Aggarwal's diagnosis of cervicalgia with a right C7 sensory radiculopathic component with associated trigger points suggestive of fibromyalgia; and (5) Dr. Aggarwal's note of electrodiagnostic evidence of minimal, bilateral carpal tunnel syndrome.

Majeski states that her doctors consistently agreed about her diagnosis and disabling nature of her impairments. Drs. Gleason, Reddy, and Aggarwal all diagnosed spondylosis, or degenerative changes of the cervical spine. The three physicians also concurred in the diagnosis of radiculopathy. Dr. Gleason diagnosed her with right cervical radicular syndrome with cervical spondylosis, also noting that upon physical examination, there was a positive right Spurling test, which was indicative of radiculopathy; Dr. Reddy's diagnosis included radicular symptoms of the upper extremity; and Dr. Aggarwal diagnosed cervicalgia with a right C7 sensory radiculopathic component with associated trigger points suggestive of fibromyalgia. Drs. Reddy, Weiss, and Aggarwal all described pain, weakness, and muscle spasms Majeski reported from her work on the computer. Drs. Weiss and Aggarwal agreed on the diagnosis of carpal tunnel syndrome.

Majeski also takes exception to MetLife's focus on what it considers to be negative or minor physical findings without taking into consideration the cumulative effect of her impairments on her ability to perform her job duties. By way of example, Majeski states that Dr. Marion improperly found that the radiculopathy diagnosis is unsupported, relying upon the "negative" EMG, without considering Dr. Gleason's finding that a positive right Spurling test corroborated his diagnosis of cervical radiculopathy, along with the findings on x-ray and MRI scan. With regard to Dr. Weiss, Majeski states that MetLife should not have disregarded his opinion that she showed arthritic degeneration in the cervical spine and that her pain had

"multifactor etiologies" and was not solely muscular. Majeski further claims that Hardin's evaluation was substantiated by reliability and validity research; it tested for Majeski's willingness to exert a maximal effort, alleviating concerns of malingering; and it determined that Majeski did not self-limit and that psychosocial and/or motivational factors did not affect the test results. Majeski states that the terms "mild" and "moderate," used with regard to her diagnoses, do not negate the fact that she suffers from functional limitations and disabling pain, and MetLife cannot discount her subjective complaints of pain. Moreover, the fact that Majeski experienced muscle spasms in response to stimuli is objective evidence of her pain.

Finally, Majeski disputes MetLife's dismissal of Dr. Weiss's functional capacity assessment. Majeski asserts that MetLife, without foundation, accuses Dr. Weiss of a dishonest clarification, Majeski of malingering, and Majeski's counsel of manipulating the medical evidence. Majeski states that these claims are particularly egregious in light of MetLife's refusal to acknowledge its own bias or that of Dr. Marion. According to Majeski, MetLife seized on Dr. Weiss's honest mistake in order to create a false rationale for deemphasizing valid evidence that she lacked the functional capacity to perform the duties of any occupation on a full-time basis.

MetLife responds that it did not arbitrarily reject the opinions of Majeski's treating physicians. MetLife states that the record instead demonstrates that there are legitimate questions about the reliability of Majeski's claim that she cannot perform sedentary work. MetLife points to disagreements among Majeski's treating physicians about the nature and extent of her medical condition. Dr. Gleason diagnosed cervical spondylosis and radiculopathy, although the MRI scans and EMG studies showed that there was no damage to the nerve function of her cervical spine. Dr. Reddy's clinical examination demonstrated that Majeski's

cervical range of motion was not impaired except at extreme ranges of extension. Dr. Reddy further stated that Majeski's neck movements did not increase the severity of her pain; there was no wasting of the muscles of her upper extremities; and there was no muscle spasm or tenderness of the cervical spine.

Dr. Weiss concluded that Majeski's symptoms were muscular in nature. Dr. Weiss ruled out cervical radiculopathy as the cause of Majeski's pain, stating that there was no electrodiagnostic evidence supporting the diagnosis. He stated that her subjective pain resulted from decreased flexibility, weakness, and muscle spasm in her upper back, shoulders, arms, and wrists. Dr. Weiss diagnosed Majeski with mild bilateral carpal tunnel syndrome based upon the EMG results. MetLife claims that Dr. Weiss's opinion was therefore in conflict with the findings of both Dr. Gleason and Dr. Reddy. Dr. Aggarwal also disagreed with Dr. Gleason, finding no evidence of radiculopathy or myelopathy. Dr. Aggarwal stated that Majeski has minimal bilateral carpal tunnel syndrome, cervicalgia, and some tender points in her shoulders suggestive of fibromyalgia but did not make a diagnosis of fibromyalgia.

According to MetLife, Majeski's treating physicians' inability to come to a consensus as to the source of her pain supports its decision to terminate benefits. MetLife contends that while some medical conditions are entirely subjective, cervical radiculopathy and nerve dysfunction associated with carpal tunnel syndrome can be objectively quantified. In Majeski's case, the objective evidence (*i.e.*, MRI scans and nerve conduction studies) reflected only mild to moderate changes in the cervical spine and, at best, minimal evidence of mild carpal tunnel syndrome, which was not consistent with Majeski's complaints of disabling pain.

Next, MetLife points out that Hardin, Majeski's own physical therapist, found that Majeski could perform "medium" level work based upon strength tests, but ultimately concluded that she could not perform sedentary work due to pain from sitting and using a computer, based upon a thirty-minute "sitting test." MetLife disputes that this is sufficient objective medical evidence that Majeski cannot perform sedentary work, arguing that it was not supported by an objectively valid testing method and instead described Majeski's pain behaviors. MetLife maintains that Majeski's extreme pain behaviors during this test are inherently subjective and are not consistent with the objective medical findings in the record.

MetLife argues that in the face of conflicting medical evidence, the arbitrary and capricious standard of review leaves questions of medical judgment to the discretion of the plan administrator. *See Semien v. Life Ins. Co.*, 436 F.3d 805, 812 (7th Cir. 2006) ("[U]nder an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions. Instead, an 'insurer's decision prevails if it has rational support in the record.'") (citation omitted). MetLife contends that it was within its discretion to decline Majeski's claim for short-term benefits based upon: (1) Dr. Marion's medical opinion that Majeski is not disabled from performing sedentary work; (2) the objective medical evidence, including the MRI scans and EMG studies; (3) Dr. Reddy's clinical findings that Majeski had normal cervical range of motion except on extreme extension; (4) Majeski's treating physicians' failure to agree on a diagnosis; (5) Dr. Weiss's failure to provide meaningful commentary supported by clinical evidence to explain his disagreement with Dr. Marion's conclusions; and (6) Hardin's exaggerated description of Majeski's pain behaviors, which was not consistent with the clinical and objective medical evidence in the record.

In determining whether a Plan Administrator's decision to terminate benefits was arbitrary and capricious, courts are directed to consider whether specific reasons for denial were communicated to the claimant, whether the claimant was given an opportunity for full and fair review by the administrator, and whether there was an absence of reasoning to support the denial. *Leger*, 2009 WL 579246, at *7. "Under the arbitrary and capricious standard, it is not our function to decide whether we would reach the same conclusion as the Plan or even rely on the same authority. . . . Instead, the court is only to determine if the decision was downright unreasonable." *Carr*, 195 F.3d at 294-95 .

The Court therefore need not undertake a lengthy analysis of the medical evidence in the record or determine the specific nature and extent of Majeski's impairments or pain level. *See Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 624 (7th Cir. 2008) ("'Raising debatable points does not entitle [the claimant] to a reversal under the arbitrary-and-capricious standard.'") (citation omitted). The fact that another reviewer may have found Majeski disabled is not relevant under the arbitrary and capricious standard of review. *See Gutta*, 530 F.3d at 620 ("[I]t is possible that we might have found more to criticize if we were conducting *de novo* review. But we are not.").

The Court's only role is to determine whether the Plan Administrator's exercise of its discretion was unreasonable given the information in the record before it. After considering the complete record, in light of MetLife's potential conflict of interest, the Court concludes that it was not. Although the evidence suggests that Majeski does suffer from some level of impairment, this Court cannot state that it was wholly unreasonable for MetLife to find that the evidence did not demonstrate that she was incapable of performing her sedentary duties.

The evidence does not show that Majeski's benefits were denied due to her failure to document her pain symptoms, as opposed to her failure to document her pain's effect on her functional capacity. The Court finds that MetLife reasonably found that the evidence did not support her claimed reduction in functional capacity. In making his recommendation, Dr. Marion considered all of Majeski's medical records, including medical tests, clinical findings, and functional capacity evaluations. *Cf. Leger*, 2009 WL 579246, at *10 ("Because the Plan's determination failed to consider [plaintiff's] complete medical history and rejected, without explanation, important aspects of the FCE, we believe that the Plan acted in an arbitrary and capricious manner in terminating [plaintiff's] benefits.").

The Court finds that Dr. Marion's conclusions were reasonable given the evidence in the record, whether or not the Court credits the substance of MetLife's arguments related to the reasons Dr. Weiss may have amended his functional capacity assessment. The original assessment stated that Majeski had 100% ability to use her fingers for fine manipulation. In his amended assessment, Dr. Weiss opined that she had 0% capacity for fine manipulation. The Court agrees with MetLife that the 0% assessment was not supported by any objective medical evidence in the record. Majeski points to no objective clinical findings of Dr. Weiss, or any of Majeski's other treating physicians, suggesting that she had no capacity for fine manipulation whatsoever. It was therefore not unreasonable for MetLife to consider the possibility that Dr. Weiss was acting as an advocate for Majeski rather than merely an objective physician. *See Davis*, 444 F.3d at 576-77 (observing that inconsistencies in the opinions of the treating physician demonstrate that he acted "more as an advocate than a doctor rendering objective opinions").

It was also not unreasonable for MetLife not to credit the functional capacity evaluation prepared by Hardin, Majeski's physical therapist. Hardin's FCE concluded that Majeski could not perform sedentary work, based upon a sitting test during which Majeski exhibited behaviors demonstrating subjective pain. But MetLife could reasonably have discounted Hardin's conclusions based upon her other clinical findings, for example that she exhibited normal range of motion of the cervical spine, shoulders, wrists, and elbows, except for "mild limitations in cervical spine rotation bilaterally, extension and side bending bilaterally." Moreover, Hardin's report also concluded that Majeski could perform work at the medium level of exertion. Finally, it was not unreasonable for MetLife to determine that Hardin's FCE was not consistent with the other objective medical evidence in the record. *See Gutta*, 530 F.3d at 620 (holding that where a plan administrator's decision was "based upon substantial evidence because it is consistent with the medical evidence in the record," it "easily satisfies the arbitrary and capricious standard of review") (citation and internal quotations omitted).

## CONCLUSION

For the foregoing reasons, Majeski's motion for summary judgment [Doc. No. 29] is denied, MetLife's motion for summary judgment [Doc. No. 56] is granted; and Majeski's motion for leave to supplement [Doc. No. 40] is denied.

**SO ORDERED.**

**ENTERED:**

**March 31, 2009**
**DATE:** _____

_____
**HON. MARIA VALDEZ**
**United States Magistrate Judge**